**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

CARENA T. KELLY,

    Plaintiff,

        v.

HORIZON MEDICAL CORPORATION
and STEVEN JADITZ, MD,

    Defendants

CIVIL ACTION NO. 3:11-CV-1501

(JUDGE CAPUTO)

## MEMORANDUM

Defendants Horizon Medical Corporation and Dr. Jaditz move to dismiss plaintiff Kelly's complaint.  Ms. Kelly alleges defendants dramatically altered her working conditions after discovering she was pregnant.  Dr. Jaditz and Horizon argue that Ms. Kelly's factual allegations fail to state claims under Title VII, the Family Medical Leave Act ("FMLA"), the Americans with Disability Act ("ADA"), or the Pennsylvania Human Relations Act ("PHRA"). The Court disagrees with defendants and will deny the motion.

## BACKGROUND

Ms. Kelly alleges the following.

Ms. Kelly currently resides in Lackawanna County, Pennsylvania.  Horizon Medical Corporation maintains a practice management business in Scranton, Pennsylvania.  It also maintains a medical practice in Clarks Summit, PA.  Dr. Steven Jaditz is a doctor of osteopathic medicine operating as a health care provider and practitioner under the control and management of Horizon.  Horizon and Dr. Jaditz provide joint employment and are integrated employers.

Ms. Kelly was hired as a physicians assistant by Horizon and Dr. Jaditz in March

2008.   For virtually her entire employment, Ms. Kelly was classified as an exempt professional employee under the FLSA.  Her performance was evaluated in July 2008 and April 2009.  She was rated as a "fully satisfactory employee" in her July 2008 performance and given a $2,000 performance bonus after her April 2009 evaluation.  Dr. Jaditz was the evaluator on both occasions.  Ms. Kelly did not abuse time off and, until June 2,2009, had a spotless disciplinary record.

Ms. Kelly had been trying to conceive for some time and had been receiving fertility treatments in Philadelphia, Pennsylvania beginning in November 2008.  In early May 2009, she found out she was pregnant. On May 12, 2009, she told Mary Beth Jaditz, the office manager and wife of Dr. Jaditz, that she would no longer be going to Philadelphia and had been transferred back for local treatment.  From that day on, Ms. Kelly's standing with her employers dropped precipitously.

The first major incident occurred on May 25, 2009.  Ms. Kelly had been off that day to be with her sister while her sister gave birth.  That evening, Ms. Kelly called Mrs. Jaditz and told her she needed the following day off because she had been up all day and night. Although Mrs. Jaditz had previously okayed the time off, she now balked at the request. She told Ms. Kelly it was inappropriate to take another day after the holiday weekend and that Dr. Jaditz was extremely upset about the request.  She then told Ms. Kelly that Ms. Kelly was required to attend a meeting with Horizon's human resources manager, Diane Arnoni, the next day.

The meeting the next day was attended by Dr. Jaditz, Mrs. Jaditz, Ms. Arnoni, and Ms. Kelly.  At the meeting, Ms. Kelly was attacked about various aspects of her job which had never previously been brought up.  Dr. Jaditz also told her it was unacceptable that she

2

requested the day off at the last minute and that she had already used up all her sick and personal time.  Ms. Kelly told Dr. Jaditz that she had had to take time off previously for surgery, but he told her all the days were the same.  Dr. Jaditz then told Ms. Kelly that a new nurse practitioner had been hired to start in July and that she would be taking over Ms. Kelly's hospital rounds responsibilities.   Regarding this decision, he stated, "You are at a period of time in your life where you have certain health issues and a need for doctor's appointments."  He also told her she was not reliable and that they needed someone "dependable."  Ms. Arnoni then accused Ms. Kelly of abandoning her work at the end of the day and not finishing her assignments.  She was then told she would no longer be working five days a week but rather four ten hour shifts.  She was also told she would have to start filling out a time card each day and would now be paid as an hourly employee. When Ms. Kelly tried to approach Dr. Jaditz about the meeting the next day, the normally cordial doctor was cold and disengaged.  When asked if her job was in jeopardy, Dr. Jaditz responded, "I'm not telling you there's the door, you're not fired...yet."

On June 1, 2009, Ms. Kelly told Mrs. Jaditz she was pregnant.  She also applied to Ms. Arnoni for leave under the FMLA on her doctor's advice.  Ms. Kelly had been told that, due to her prior medical conditions, she was considered a high risk pregnancy and may need to miss work intermittently. The next day, Ms. Arnoni denied her FMLA request.  She told Ms. Kelly the request was premature and that she did not need FMLA since she could make her medical appointments for before or after work.  Ms. Arnoni then went on to ask intrusive personal questions, including Ms. Kelly's plans for after the baby's birth.  During that same discussion, Ms. Arnoni told Ms. Kelly that Dr. and Mrs. Jaditz had suspected Ms. Kelly was pregnant because she was acting "hormonal."  That same day, Dr. Jaditz gave

3

Ms. Kelly a document on Horizon letterhead that outlined a number of unilateral changes to her work agreement: she was now an hourly employee; she lost a week of vacation time; she would have to give two weeks notice for doctor's appointments; and she would have to physically attend seminars for CME credits. Ms. Kelly tried to discuss these changes with Dr. Jaditz but he flatly stated, "This is how it's going to be."

Ms. Kelly was very upset by these events. On June 4, 2009, she called out sick with symptoms of nausea and diarrhea. She then received harassing voicemails from Mrs. Jaditz and Ms. Arnoni wanting to know where she was. Ms. Arnoni also called Ms. Kelly's husband, asking him if she was really sick. After seeing her doctor, Ms. Kelly's attorney sent Horizon and Dr. Jaditz a notice of involuntary separation on June 5, 2009.

After exhausting all administrative prerequisites, Ms. Kelly filed this suit on August 14, 2011. In her amended complaint, she alleges violations of Title VII (count I), the FMLA (count II), the ADA (count III), and the PHRA (count IV). Horizon and Dr. Jaditz have filed a motion to dismiss. The motion has been briefed and is ripe for review.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. When considering a Rule 12(b)(6) motion, the Court's role is limited to determining if a plaintiff is entitled to offer evidence in support of their claims. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). The Court does not consider whether a plaintiff will ultimately prevail. *See id.* A defendant bears the burden of establishing that a plaintiff's complaint fails to state a claim. *See Gould Elecs. v. United States,* 220 F.3d 169, 178 (3d Cir. 2000).

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a). The statement required by Rule 8(a)(2) must give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555).  Detailed factual allegations are not required. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, mere conclusory statements will not do; "a complaint must do more than allege the plaintiff's entitlement to relief."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211.  Instead, a complaint must "show" this entitlement by alleging sufficient facts. *Id.*  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

As such, the inquiry at the motion to dismiss stage is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged."  *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

Dismissal is appropriate only if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), meaning enough factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element, *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

In deciding a motion to dismiss, the Court should consider the allegations in the complaint, exhibits attached to the complaint, and matters of public record. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). The Court may also consider "undisputedly authentic" documents when the plaintiff's claims are based on the documents and the defendant has attached copies of the documents to the motion to dismiss. *Id.* The Court need not assume the plaintiff can prove facts that were not alleged in the complaint, *see City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 & n.13 (3d Cir. 1998), or credit a complaint's "'bald assertions'" or "'legal conclusions,'" *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997)).

## DISCUSSION

**I.    Title VII claim**

Horizon and Dr. Jaditz argue that the Title VII claim should be dismissed because Ms. Kelly has failed to plead facts establishing that either of them are "employers" under the Act. They also argue she has not alleged enough facts to adequately plead either a hostile work environment nor a gender discrimination claim.

**A.      "Employer" under Title VII**

42 U.S.C.A. § 2000e defines an "employer" as a:

[P]erson engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of Title 5), or (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of Title 26, except that during the first year after March 24, 1972, persons having fewer than twenty-five employees (and their agents) shall not be considered employers.

Company and its affiliates are considered "single employer" under Title VII when (1) company has split itself into entities with less than fifteen employees intending to evade Title VII's reach, or (2) parent company has directed subsidiary's discriminatory act of which employee is complaining, or (3) court would substantively consolidate entities in bankruptcy context. *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72 (3d Cir. 2003).  To determine whether the "consolidation" theory applies, the Third Circuit has directed courts to adopt a "open-ended, equitable inquiry . . . to determine when substantively to consolidate two entities." *Id.* at 86-7.  Relevant operational factors include (1) the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions ( e.g., hiring and personnel matters), (2) whether they present themselves as a single company such that third parties dealt with them as one unit, (3) whether a parent company covers the salaries, expenses, or losses of its subsidiary, and (4) whether one entity does business exclusively with the other. *Id.* at 87.

Here, Ms. Kelly has alleged enough facts to establish that Horizon and Dr. Jaditz are a single employer under either the "direction" or "consolidation" theories.

Under the theory that Horizon directed the discriminatory acts, she alleges that Dr. Jaditz works under the control and management of Horizon.  Additionally, many of the

alleged discriminatory acts were either committed directly by Ms. Arnoni or at least with her apparent approval. She is the one who denied Ms. Kelly's FMLA request. She was present at the meeting on June 26, 2009 where the complaints about Ms. Kelly were raised and the unilateral changes to the terms of her employment were first broached. Also, these changes to the work agreement were in a document on Horizon letterhead. Since Ms. Arnoni was Horizon's HR manager, it is reasonable to assume she played some role in effecting these changes either drafted the changes or signed off on them.

These same facts substantiate viewing Horizon and Dr. Jaditz as a single employer under the "consolidation" theory as well. Again, Ms. Arnoni was involved in the May 26, 2009 meeting and the revised work agreement was a Horizon document. These facts show a significant degree of unity between Horizon and Dr. Jaditz, at least on the subject of personnel matters.

At this point the relationship between Horizon and Dr. Jaditz is unclear. Also, it is not known whether the alleged discriminatory acts were done at Horizon's behest or merely with their knowledge. However, at this stage, Ms. Kelly has sufficiently alleged they are a single employer for purposes of Title VII.

B.      Title VII "Hostile work environment" claim

A hostile work environment exists when unwelcome racist, ageist, or sexist conduct unreasonably interferes with a person's performance or creates an intimidating, hostile, or offensive working environment. *See Weston v. Pennsylvania*, 251 F.3d 420, 425-26 (3d Cir.2001) To establish a prima facie hostile work environment case plaintiff must prove: (1) she suffered intentional discrimination because of his membership in a protected class; (2) the discrimination was severe or pervasive; (3) she was detrimentally affected by the

discrimination; (4) the discrimination would detrimentally affect a reasonable person in her position; and (5) respondeat superior liability exists. *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir.2001).

"[T]he harassment must be so severe or pervasive that it alters the conditions of employment and creates an abusive environment." *Weston*, 251 F.3d at 426. Courts consider the following factors to determine whether an environment is hostile or abusive: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance." *Weston*, 251 F.3d at 426 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Here, Ms. Kelly has alleged harassment severe enough to detrimentally affect a reasonable person. Ms. Kelly alleges that once Horizon and Dr. Jaditz caught wind of her pregnancy in May 2009, she went from being a lauded employee to a pariah. First, she was berated by Mrs. Jaditz on the evening of May 25, 2009 over leave time that had already been approved. Then, at an emergency meeting the next day, she was confronted by Ms. Arnoni, and Dr. and Mrs. Jaditz with a barrage of previously unmentioned complaints. She was also told that a new nurse practitioner had been hired and would be relieving her of many of her duties. She was also told that her work agreement had been unilaterally and significantly changed. When she tried to talk to Dr. Jaditz, he was uncharacteristically cold with her. Ms. Kelly alleges these events forced her to quit. The Court finds these actions, if true, created a "hostile work environment."

### C.     Title VII gender\pregnancy discrimination claim

An employee can establish gender discrimination under Title VII in one of two ways: (1) by direct evidence that the employer's decision was motivated by discrimination; or (2) by indirect evidence that creates an inference of discrimination.

Indirect, or circumstantial, evidence of discrimination is evidence that creates an inference of discrimination. When an employee relies on circumstantial evidence of discrimination, she must first establish a prima facie case before any burden shifts to the employer. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To establish a prima facie case of pregnancy discrimination, the employee must demonstrate that: (1) she was pregnant and her employer knew of her condition; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) there is some nexus between her pregnancy and the adverse employment action that would permit a factfinder to infer unlawful discrimination. *Doe v. C.A.R.S. Protection Plus*, 527 F.3d 358, 365 (3d Cir. 2008).  One way to satisfy this fourth element is to demonstrate that similarly situated, non-pregnant employees were treated more favorably. Another way to do so is to produce evidence of temporal proximity between the adverse employment action and the pregnancy.

Finally, it should be noted that a plaintiff alleging employment discrimination is not required to plead facts necessary to establish a prima facie case under *McDonnell Douglas*, *Lucchesi v. Day & Zimmerman* Group, No. 10-4164, 2011 WL 1540385, *4 (E.D.Pa. April 21, 2011) (citing *Swierkiewicz v. Sorema*, 534 U.S. 506, 508 (2002)).  *See also, e.g. Harley v. Paulson*, 07-3559, 2008 WL 5189931, *3 (D.N.J. Dec. 9, 2008)(plaintiff's allegations that because he was African American his IRS supervisors delayed his promotion until 2006 and denied him a temporary transfer while injured deemed sufficient); *see also Hodczak v.*

*Latrobe Specialty Steel Co.*, No. 08-649, 2009 WL 911311, *6 (W.D.Pa. March 31, 2009)(allegations sufficient where plaintiff brought an ADEA claim and detailed events leading up to his termination, including relevant dates and names of persons involved in the decision to fire him).

Ms. Kelly has established a prima facie case of pregnancy discrimination.  She alleges that: (1) she was pregnant and her employer became aware of the pregnancy somewhere between May 12 and June 1, 2009; (2) she had received two good performance reviews and a performance bonus in April 2009; (3) she suffered a number of adverse employment actions, including being made an hourly employee, having her shift changed, having duties taken away from her, and losing vacation time; and (4) the close temporal proximity between these actions and the pregnancy permits an inference of unlawful discrimination – in less than two months Ms. Kelly went from being a model to a former employee.

## II.     The FMLA claim

Horizon and Dr. Jadetz argue that Ms. Kelly has failed to properly allege that: (1) either she was an "eligible employee" or that they were an "employer" under the FMLA; (2) that she had any serious health condition that entitled her FMLA leave; and (3) since she was not eligible for leave, there could not have been any interference with her rights.

### A.     "Eligible employee" and "employer" under the FMLA

29 U.S.C. § 2611(2)(A) defines an "eligible employee" as an employee who has been employed: "(i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period."

29 U.S.C. § 2611(4)(A) defines an "employer" as: "any person engaged in commerce

or in any industry or activity affecting commerce who employs 50 or more employees for

each working day during each of 20 or more calendar workweeks in the current or preceding

calendar year."

29 C.F.R. § 825.106 states, in pertinent part, that:

(a) Where two or more businesses exercise some control over the work or working conditions of the employee, the businesses may be joint employers under FMLA. Joint employers may be separate and distinct entities with separate owners, managers, and facilities. Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:

(1) Where there is an arrangement between employers to share an employee's services or to interchange employees;

(2) Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee; or,

(3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer.

(b)(1) A determination of whether or not a joint employment relationship exists is not determined by the application of any single criterion, but rather the entire relationship is to be viewed in its *totality*.

(emphasis added).

Here, Ms. Kelly has alleged she was a full-time employee who had been working

for Horizon and Dr. Jaditz since March 2008 when she made her request on June 2, 2009

for FMLA leave.  She has thus established she was an eligible employee under 29 U.S.C.

§ 2611(2)(A).  She has also sufficiently pled Horizon and Dr. Jaditz were "joint employers"

under 29 C.F.R. § 825.106 for the same reasons that established they were a "single

employer" under Title VII.

## B.    "Entitlements" under the FMLA

29 U.S.C. § 2612(a)(1) states:

Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:

(A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

(B) Because of the placement of a son or daughter with the employee for adoption or foster care.

(C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

(E) Because of any qualifying exigency (as the Secretary shall, by regulation, determine) arising out of the fact that the spouse, or a son, daughter, or parent of the employee is on covered active duty (or has been notified of an impending call or order to covered active duty) in the Armed Forces.

Further, "[a] serious heath condition . . . includes . . . [a]ny period of incapacity due to pregnancy, or for prenatal care." 29 C.F.R. § 825.115.

Here, Ms. Kelly had been told by her doctor that her pregnancy was "high risk" due to her medical history.  As a result, she went to Ms. Arnoni about FMLA leave.  It is unclear whether she was filing for immediate FMLA leave or was merely putting in for leave for when her pregnancy advanced.  But she has adequately pled the existence of a serious health condition that made her unable to perform the functions of her position as provided for in the Act.

## C.    "Interference" under the FMLA

29 C.F.R. § 825.220(b) states:

Any violations of the [FMLA] or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act. An employer may be liable for compensation and benefits lost by reason of the violation, for other actual monetary losses sustained as a direct result of the violation, and for appropriate equitable or other relief, including employment, reinstatement, promotion, or any other relief tailored to the harm suffered (see § 825.400(c)).

"Interfering with" the exercise of an employee's rights would include, for example, *not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.*

(emphasis added).

Ms. Kelly alleged that after when she went to see Ms. Arnoni about requesting FMLA leave due to her pregnancy being high risk, she was told that it was too soon for her to apply and that she should see her doctors before or after work.  Ms. Kelly has thus sufficiently pled "interference" under the Act.

**III.     The ADA claim**

Horizon and Dr. Jaditz argue that Ms. Kelly's ADA claim fails because she has not established either of them are an "employer" under 42 U.S.C. § 1211(5)(A) nor that she was "disabled."  The "employer" issue has already been discussed with respect to Title VII and the FMLA above.

Section 12112(a) of Title 42, United States Code, provides that: "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

A "qualified individual with a disability" is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

To establish a prima facie case of discrimination under the ADA, a plaintiff must therefore show "(1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable

accommodations by the employer; and (3) she has suffered an otherwise adverse

employment decision as a result of discrimination." *Williams v. Phil. Hous. Auth. Police*

*Dept.*, 380 F.3d 751, 761 (3d Cir. 2004) (internal citations omitted).

A person is 'regarded as' having a disability if the person:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has [no such impairment] but is treated by a covered entity as having a substantially limiting impairment.

*Williams*, 380 F.3d at 764 (quoting *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 188 (3d

Cir.1999)).  42 U.S.C. § 12102(3)(A) states:

An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

Ms. Kelly alleges she was "regarded as" disable due to her high-risk pregnancy and

suffered adverse employment actions as a result.  Specifically, a substantial share of her

duties were taken away.  Horizon and Dr. Jaditz argue that these decisions were made prior

to Ms. Kelly's pregnancy announcement on June 1, 2009.  But Ms. Kelly claims that they

knew about the pregnancy as early as May 12, 2009 when she told Mrs. Jaditz she would

no longer be going to Philadelphia for fertility treatments.  Ms. Kelly's allegations are

sufficient to support an ADA claim.

**IV.    The PHRA claim**

Ms. Kelly has voluntarily withdrawn her request for punitive damages in her PHRA

claim.   Additionally, analysis of PHRA gender discrimination claims follow the same

framework as Title VII claims.  Since the Court has already determined that it will not

dismiss the Title VII claim, it likewise will not dismiss the PHRA claim.

## CONCLUSION

For the reasons discussed above, Horizon's and Dr. Jaditz's motion to dismiss will not be granted.

An appropriate order follows.


 1/6/12                                                          /s/ A. Richard Caputo
Date                                                            A. Richard Caputo
                                                               United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CARENA T. KELLY, | |
| Plaintiff, | CIVIL ACTION NO. 3:11-CV-1501 |
| v. | |
| HORIZON MEDICAL CORPORATION and STEVEN JADITZ, MD, | (JUDGE CAPUTO) |
| Defendants | |

**ORDER**

    **NOW**, this ____6th____ day of January, 2012, **IT IS HEREBY ORDERED** that

defendants' motion to dismiss (Doc. 7) is **DENIED**.


                    /s/ A. Richard Caputo
                    A. Richard Caputo
                    United States District Judge