**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CARENA T. KELLY,** | : | |
| **Plaintiff** | : | |
| | | **CIVIL ACTION NO. 3:11-1501** |
| **v.** | : | |
| | | **(JUDGE MANNION)** |
| **HORIZON MEDICAL CORPORATION and STEVEN** | : | |
| **JADITZ, M.D.,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff and her husband had for many years wanted a family, but she had medical issues effecting her ability to become pregnant. In an attempt to fulfill her lifelong yearning to have children, the plaintiff sought fertility treatments and, in April 2009, she learned that her treatments were successful. Rather than share in her joy, upon learning of her pregnancy, the plaintiff claims that her employers treated her as if she were disabled, denied her leave for pre-natal care under the Family Medical Leave Act, ("FMLA"), and ultimately forced her to resign her position as a physician's assistant – all because she was pregnant. The court is now called upon to determine whether the defendants, through their motion for summary judgment and related materials, have established that there are no material issues of fact for trial as to the plaintiff's claims and that they are entitled to judgment as matter of law. Following a methodical review of the briefs, exhibits and necessary elements of each count, the court is compelled to find that the

defendants have, in fact, met their burden on summary judgment and that they are entitled to judgment as a matter of law.

## I.   PROCEDURAL HISTORY.

By way of relevant background, the plaintiff filed the instant employment discrimination action on August 14, 2011. (Doc. 1). An amended complaint was filed on October 28, 2011. (Doc. 6).

On November 7, 2011, the defendants filed a motion to dismiss the plaintiff's complaint, (Doc. 7), which was ultimately denied by memorandum and order dated January 6, 2012, (Doc. 13)[1].

An answer to the plaintiff's amended complaint was filed by the defendants on March 2, 2012. (Doc. 14).

On August 1, 2013, the defendants filed the pending motion for summary judgment with exhibits, (Doc. 27), as well as a statement of material facts, (Doc. 28). A brief in support of the motion was filed on August 9, 2013. (Doc. 29). On September 30, 2013, the plaintiff filed a brief in opposition to the defendants' motion for summary judgment, along with a response to the defendants' statement of facts and exhibits. (Doc. 34). A reply brief was filed by the defendants on October 11, 2013. (Doc. 35).

---

[1]The memorandum and order was prepared by the Honorable A. Richard Caputo, to whom the instant action was originally assigned. The matter was reassigned to the undersigned by verbal order dated January 4, 2013.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Cas. & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party

can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

## III.   DISCUSSION

The allegations of the plaintiff's amended complaint, as previously set forth by the court in its memorandum dated January 6, 2012, are as follows:

> Ms. Kelly currently resides in Lackawanna County, Pennsylvania. Horizon Medical Corporation maintains a practice in Clarks Summit, PA. Dr. Steven Jaditz is a doctor of osteopathic medicine operating as a health care provider and practitioner under the control and management of Horizon. Horizon and Dr.

Jaditz provide joint employment and are integrated employers.

Ms. Kelly was hired as a physicians assistant by Horizon and Dr. Jaditz in March 2008. For virtually her entire employment, Ms. Kelly was classified as an exempt professional employee under the FLSA[2]. Her performance was evaluated in July 2008 and April 2009. She was rated as a "fully satisfactory employee" in her July 2008 performance and was given a $2,000 performance bonus after her April 2009 evaluation. Dr. Jaditz was the evaluator on both occasions. Ms. Kelly did not abuse time off and, until June 2, 2009, had a spotless disciplinary record.

Ms. Kelly had been trying to conceive for some time and had been receiving fertility treatments in Philadelphia, Pennsylvania beginning in November 2008. In early May 2009, she found out she was pregnant. On May 12, 2009, she told Mary Beth Jaditz, the office manager and wife of Dr. Jaditz, that she would no longer be going to Philadelphia and had been transferred back for local treatment. From that day on, Ms. Kelly's standing with her employers dropped precipitously.

The first major incident occurred on May 25, 2009. Ms. Kelly had been off that day to be with her sister while her sister gave birth. That evening, Ms. Kelly called Mrs. Jaditz and told her she needed the following day off because she had been up all day and night. Although Mrs. Jaditz had previously okayed the time off, she now balked at the request. She told Ms. Kelly it was inappropriate to take another day after the holiday weekend and that Dr. Jaditz was extremely upset about the request. She then told Ms. Kelly that Ms. Kelly was required to attend a meeting with Horizon's human resources manager, Diane Arnoni, the next day.

The meeting the next day was attended by Dr. Jaditz, Mrs. Jaditz, Ms. Arnoni, and Ms. Kelly. At the meeting, Ms. Kelly was attacked about various aspects of her job which had never previously been brought up. Dr. Jaditz also told her it was unacceptable that she requested the day off at the last minute and that she had already used up all her sick and personal time. Ms. Kelly told Dr. Jaditz that she had had to take time off previously for surgery, but he told her all the days were the same. Dr. Jaditz then told Ms. Kelly that a new nurse practitioner had been hired to start in July and that she would be taking over Ms. Kelly's hospital rounds responsibilities. Regarding this decision, he stated, "You are at a period of time in your life where you have certain health issues and a need for doctor's appointments." He

---

[2]Fair Labor Standards Act of 1938, 29 U.S.C.A. §§201, et seq.

also told her she was not reliable and that they needed someone "dependable." Ms. Arnoni then accused Ms. Kelly of abandoning her work at the end of the day and not finishing her assignments. She was then told she would no longer be working five days a week but rather four ten hour shifts. She was also told she would have to start filling out a time card each day and would now be paid as an hourly employee. When Ms. Kelly tried to approach Dr. Jaditz about the meeting the next day, the normally cordial doctor was cold and disengaged. When asked if her job was in jeopardy, Dr. Jaditz responded, "I'm not telling you there's the door, you're not fired . . . yet."

On June 1, 2009, Ms. Kelly told Mrs. Jaditz she was pregnant. She also applied to Ms. Arnoni for leave under the FMLA on her doctor's advice. Ms. Kelly had been told that, due to her prior medical conditions, she was considered a high risk pregnancy and may need to miss work intermittently. The next day, Ms. Arnoni denied her FMLA request. She told Ms. Kelly the request was premature and that she did not need FMLA since she could make her appointments for before or after work. Ms. Arnoni then went on to ask intrusive personal questions, including Ms. Kelly's plans for after the baby's birth. During that same discussion, Ms. Arnoni told Ms. Kelly that Dr. and Mrs. Jaditz had suspected Ms. Kelly was pregnant because she was acting "hormonal." That same day, Dr. Jaditz gave Ms. Kelly a document on Horizon letterhead that outlined a number of unilateral changes to her work agreement: she was now an hourly employee; she lost a week of vacation time; she would have to give two weeks notice for doctor's appointments; and she would have to physically attend seminars for CME credits. Ms. Kelly tried to discuss these changes with Dr. Jaditz but he flatly stated, "This is how it's going to be."

Ms. Kelly was very upset by these events. On June 4, 2009, she called out sick with symptoms of nausea and diarrhea. She then received harassing voicemails from Mrs. Jaditz and Ms. Arnoni wanting to know where she was. Ms. Arnoni also called Ms. Kelly's husband, asking him if she was really sick. After seeing her doctor, Ms. Kelly's attorney sent Horizon and Dr. Jaditz a notice of voluntary separation on June 5, 2009.

(Doc. 13, pp. 1-4).

Based upon these allegations, the plaintiff filed the instant action in

which she alleges violations of Title VII, ("Count I"), the FMLA, ("Count II"), the Americans with Disabilities Act, ("ADA"), ("Count III"), and the Pennsylvania Human Relations Act, ("PHRA"), ("Count IV").

In an attempt to controvert the allegations set forth in the plaintiff's amended complaint and to establish that there are no genuine issues of material fact for trial, the defendants have filed the instant motion for summary judgment along with a statement of material facts, the following of which are not in dispute.

The plaintiff began her employment with the defendants on March 30, 2008. The plaintiff signed an Employment Agreement, ("Agreement"), two days later which governed the terms of her employment. Certain terms of the Agreement, such as salary and benefits, were negotiated specifically by the plaintiff with Diane Arnoni, the Human Resource Administrator, and  Johnna Jalowiec[3]. For instance, while the original Agreement furnished to the plaintiff proposed a two-week paid vacation under Section 9, through negotiations, the plaintiff's Agreement was written such that she was entitled to three weeks of paid leave under Section 9 – two weeks for vacation and one week for Continuing Medical Education, ("CME"). In the first year of her employment, the plaintiff completed her CME online and used all three weeks under Section 9 of her Agreement as vacation weeks without objection. (Doc. 34, Ex. A, pp. 43-44).

---

[3]The court has no information as to the position of Ms. Jalowiec.

From the beginning, the plaintiff's employment was based upon a forty-hour work week; her gross pay was either $2,307.70 or $2,308.00 every two weeks[4]/[5]; and she was required to sign time cards.

The plaintiff was not required to work weekends as part of her employment; however, during the first few months of her employment, Dr. Jaditz asked her to work hospital rounds and take call on the weekends. The plaintiff did not agree to do so[6], and afterwards there were no further requests for her to work weekends. (Doc. 34, Ex. A, pp 21-22).

Starting in November of 2008 up through May 12, 2009, the plaintiff was treated for fertility issues by Dr. Friedman in Philadelphia, Pennsylvania. The plaintiff's employers were at all times aware of her fertility treatments and, during this time, the plaintiff concedes that she was treated no differently than other employees. Dr. and Mrs. Jaditz were supportive of giving the plaintiff

---

[4]This is with the exception of her final pay period for which the plaintiff worked only twenty-four (24) hours and was paid $692.40.

[5]Citing to her earnings statements dating from May 6, 2009, through June 17, 2009, the plaintiff denies this fact challenging the manner in which her pay amount was determined, i.e., by salary or hourly. Putting aside how the amount was calculated for now, the earnings statements reflect that the defendants' statement, at least with respect to the earnings statements before the court, is correct.

[6]Plaintiff testified at her deposition that she would have done so if defendants agreed to increase her salary accordingly; however, there is no testimony to indicate that she expressed this to Dr. Jaditz. (Doc. 34, Ex. A, pp. 91-92).

time off for fertility treatments and the plaintiff never had to take FMLA leave to obtain fertility treatments.

Beginning February 6, 2009, the plaintiff was absent from work for approximately four to five days as a result of fertility related surgery. The plaintiff used sick time during this absence from work. (Doc. 34, Ex. A, p. 14).

The plaintiff learned that she was pregnant with her first child around the beginning of April 2009. (Id.).

In either late April or May of 2009, the plaintiff asked for suggestions as to how she could improve her performance at work[7].

In the meantime, on May 12, 2009, the plaintiff had a conversation with Mrs. Jaditz during which the plaintiff made reference to the fact that she no longer needed to go to Philadelphia for fertility treatments and had been transferred back for local treatment. The plaintiff at this time also requested a day off around the time that her sister was due to give birth. The plaintiff further indicated during this conversation that she wanted to be in the delivery room with her sister[8]. During this pay period, the plaintiff's payroll records

---

[7]The plaintiff testified that this took place during her April 2009 performance review, (Doc. 34, Ex. A, pp. 78-80), while Dr. Jaditz testified that the plaintiff asked for the suggestions on either May 26, 2009, or May 27, 2009, (Doc. 34, Ex. C, pp. 11-12).

[8]The plaintiff disputes that she requested a day off *because* she wanted to be in the delivery room with her sister. She contends that she simply asked for one day off around the time that her sister gave birth and her employer

(continued...)

were changed to reflect an hourly rate of pay for the plaintiff of $28.85[9].

The plaintiff's sister gave birth in the early afternoon of May 25, 2009, which was Memorial Day, a day that the plaintiff already had off of work. The plaintiff called Mrs. Jaditz on the evening of May 25, 2009, to request off the following day, May 26, 2009. Although the plaintiff did not report to work at Horizon on May 26, 2009, that evening, she did report to her other job at Carmel Ardito School of Dance, where she worked as a dance instructor.

After the plaintiff called off on the evening of May 25, 2009, the defendants scheduled a meeting with the plaintiff for the afternoon of May 26, 2009, the day she requested off, to discuss her attendance and performance. At this meeting, Dr. Jaditz referred to the plaintiff as being "at a certain period of time in [her] life where [she] had health issues and required going to doctor visits . . ." (Doc. 34, Ex. A, pp. 68-69), and indicated that they needed someone who was dependable. The plaintiff was also informed during this meeting that she would in the future be required to complete her time card to detail her hours of work as opposed to her former practice of simply signing a time card which indicated that the plaintiff worked a regular or half day.

The first time that the plaintiff verbally communicated the fact that she

---

[8](...continued)
approved that request.

[9]Diane Arnoni has provided an affidavit, in which she indicates that the inclusion of an hourly rate of pay on the plaintiff's payroll records was for recordkeeping purposes only. (Doc. 35, Attachment).

was pregnant to her employer was on June 1, 2009. The plaintiff asked Diane Arnoni about FMLA paperwork on the following day[10].

On June 2, 2009, Dr. Jaditz issued the plaintiff a memorandum containing nine points, which he claims were responsive to the plaintiff's request for suggestions on how to improve her performance. Of the nine areas discussed, the plaintiff challenges only the requirement that she fill out a time card detailing her hours (as had been discussed at the May 25, 2009 meeting), and the requirement that she use the one week designated in her Agreement to actually attend CME and not use the week as an extra week of vacation.

June 3, 2009, was the last day that the plaintiff presented to work at Horizon; she did not work on June 4, 2009, having called off sick; and she resigned her employment on June 5, 2009.

### A.   Title VII and PHRA Claims[11]

The defendants argue in their motion that they are entitled to summary

---

[10]Plaintiff further testified that she inquired about FMLA leave with Mrs. Jaditz on June 1, 2009, when she informed Mrs. Jaditz that she was pregnant, and Mrs. Jaditz referred her to Diane Arnoni.

[11]Analysis of disparate treatment claims under the PHRA is equivalent to that under Title VII and other federal anti-discrimination statutes. See, e.g., Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 n.5 (3d Cir. 2006); Fasold v. Justice, 409 F.3d 178, 184 n.8 (3d Cir. 2005). Therefore, the court's analysis set forth herein applies to the plaintiff's claims arising under both Title VII and the PHRA.

judgment with respect to the plaintiff's Title VII pregnancy discrimination and PHRA claims.

Title VII prohibits an employer from discriminating against an employee on the basis of that employee's sex. 42 U.S.C. §2000e-2(a). The Pregnancy Discrimination Act, ("PDA"), provides that sex includes an employee's pregnancy, which means that discrimination because of an employee's pregnancy is a violation of Title VII. 42 U.S.C. §2000e(k). An employer violates the PDA if an employee's pregnancy was "a motivating factor for any employment practice." 42 U.S.C. §2000e-2(m). Because the PDA is part of Title VII, a claim arising under it based on indirect evidence is analyzed according to the McDonnell Douglas test[12]. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 318 (3d Cir. 2000); Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 580 (3d Cir. 1996).

To establish a *prima facie* case of pregnancy discrimination, the plaintiff must establish: (1) she was pregnant and that her employer knew she was pregnant; (2) she was qualified for her job[13]; (3) she suffered an adverse employment decision; and (4) there is some nexus between the pregnancy

---

[12]There is no direct evidence of discrimination presented in this case.

[13]The defendants concede this element for purposes of the instant motion for summary judgment.

and the adverse employment decision that would permit a fact-finder to infer unlawful discrimination. Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 366 (3d Cir. 2008). It is the plaintiff who bears the initial burden of establishing a *prima facie* case of discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-08 (1993).

As to the first element, the defendants do not dispute that the plaintiff was pregnant as of April 2009, but argue that, while the plaintiff alleges that they began subjecting her to discrimination as early as May 26, 2009, she admits that she never told her employers that she was pregnant until June 1, 2009. The defendants argue that the plaintiff has presented no evidence to establish that her employers knew that she was pregnant prior to June 1, 2009, when she informed them of such.

In a case alleging pregnancy discrimination, to raise an inference of an unlawful discharge, the plaintiff must adduce evidence of the employer's knowledge of the her pregnancy. Geraci at 580-81. "If the pregnancy is not apparent and the employee has not disclosed it to her employer, she must allege knowledge and present, as part of her *prima facie* case, evidence from which a rational jury could infer that the employer knew that she was pregnant." Id. at 581.

The record here establishes that the plaintiff's employers knew that she was undergoing fertility treatments in Philadelphia from November 2008 through May 12, 2009. (Doc. 34, Ex. C, p. 9). On May 12, 2009, the plaintiff

told Mary Beth Jaditz, the office manager and wife of Dr. Jaditz, that she no longer needed to go to Philadelphia for fertility treatments and had been transferred back for local treatment. (Doc. No. 34, Ex. A, p. 66). Two weeks later, during a meeting with the plaintiff, Dr. Jaditz referred to the plaintiff as being "at a certain period of time in [her] life where [she] had health issues and required going to doctor visits . . ." (Doc. 34, Ex. A, pp. 68-69). On June 1, 2009, the day that the plaintiff told Dr. Jaditz she was pregnant, the plaintiff testified that Diane Arnoni, the Human Resource administrator, informed her that Dr. and Mrs. Jaditz "had suspected that [the plaintiff] was pregnant for some time now and they thought [she] was being hormonal." (Doc. 34, Ex. A, pp. 92-93). Contrary to the plaintiff's sworn testimony, attached to their reply brief, the defendants have provided the affidavit of Ms. Arnoni in which she denies ever making this statement. (Doc. 35, Attachment).

The central question here is whether the plaintiff has provided sufficient evidence to raise a material question as to whether the defendants, in fact, knew she was pregnant. There is no documentary evidence which would either demonstrate or negate the defendants' knowledge of the plaintiff's pregnancy. Instead, as to this issue, the court has only the deposition testimony of the parties and the affidavit of Ms. Arnoni. If the court were to conclude, as the defendants would argue, that the plaintiff has presented no evidence from which a jury could infer that the defendants knew she was pregnant, the court would, in essence, be disregarding the plaintiff's

deposition testimony and ultimately deciding a matter of credibility. This is not the duty of the court on a motion for summary judgment. Viewing the evidence in a light most favorable to the plaintiff, the court finds that a reasonably jury could find the plaintiff's testimony to be the more credible. The court therefore disagrees with the defendants' argument that the plaintiff has failed to present any evidence from which a rational jury could infer that the defendants knew the plaintiff was pregnant.

Even if the plaintiff had established that her employers knew of her pregnancy, the defendants argue that no adverse employment action was ever taken against her and, as such, she cannot meet the third prong of her *prima facie* case. Here, the defendants correctly argue that, in order to constitute an adverse employment action, the plaintiff must have endured "a materially adverse change in the terms and conditions of employment," which "must be more disruptive than a mere inconvenience or alteration of job responsibilities: it might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities or other indices unique to a particular situation."

The plaintiff claims the following adverse employment actions were taken against her: the defendants demoted her by changing her pay structure from that of a salaried employee to an hourly employee and stripping her of some of her job responsibilities; they deprived her of one week of vacation to

15

which she was formerly entitled; and they constructively terminated her employment[14].

First, as to the plaintiff's claim that she was demoted, while the court can see why the plaintiff views as suspect the timing of the change in her payroll records and the requirement that she report her actual hours worked on her time cards, these actions do not establish the plaintiff's claim that she was, in fact, demoted and thereby subjected to an adverse employment action. The plaintiff's Agreement provided for a salary of $60,000 per year. On average then, the plaintiff's bi-weekly wage would be $28.85 per hour for 80 hours of work – the same wage she was being paid until her last day at Horizon. In fact, when the plaintiff's payroll records were amended to add the hourly rate of $28.85, the plaintiff's total gross pay apparently increased – although by a *de minimus* amount – from $2,307.70 to $2,308.00. Moreover, as to the time card requirement, since its inception, the plaintiff acknowledges that her employment required a 40-hour work week. Although they had not done so in the past, the defendants were not outside of their rights to require the plaintiff, even as a salaried employee, to demonstrate that she was actually working the 40 hours for which she was being paid by requiring her to complete her time cards in a more detailed manner. In any event, as set

---

[14]Plaintiff concedes that any other changes to the terms of her employment discussed by defendants in their motion for summary judgment did not constitute adverse employment actions.

forth above, for any demotion to be considered an adverse employment action, the plaintiff must demonstrate some detriment to her salary or benefits, which she has not. Throughout the relevant time period the plaintiff was required to work the same amount of time and she was paid the same amount of money. There is simply no evidence on the record before the court that the change in the plaintiff's payroll records or the requirement by the defendants that she complete her time cards in a more detailed manner constituted an adverse employment action.

Related to her claim that she was demoted, citing to the deposition of Dr. Jaditz, the plaintiff contends that subsequent to the discontinuation of her fertility treatments, she was informed that she would no longer be permitted to cover hospital and nursing home rounds and that the defendants would be hiring a new employee to assume those responsibilities. The plaintiff claims that these diminished responsibilities constituted an adverse employment action. Despite the plaintiff's contention, however, upon review of the cited testimony, Dr. Jaditz testified only that he discussed with the plaintiff his intent to hire a nurse practitioner "to help with rounding and nursing homes," not that the plaintiff would no longer be permitted to perform these duties[15]. Moreover,

---

[15]There is a question of fact as to whether nursing rounds were even a function of the plaintiff's job. The plaintiff testified that, while she was not required to do nursing rounds every week, she had performed nursing rounds during her employment with Horizon as a "now and again thing." (Doc. 34, Ex. A, pp. 26-27). Dr. Jaditz, however, testified that nursing home rounds were (continued...)

there is some indication that at least a portion of these duties would take place on weekends, which the plaintiff had previously not agreed to work. The record does not support the plaintiff's claim that her job responsibilities were reassigned and, as result, she was demoted. Therefore, the court finds that the plaintiff did not suffer an adverse employment action in this respect.

Second, the plaintiff argues that she suffered a reduction in benefits constituting an adverse employment action when she had her paid vacation time reduced from three weeks to two weeks once she was informed that she would no longer be allowed to substitute her one week of CME time for vacation time. Plaintiff argues that the one week of CME appears under the "Vacation" subheading of her Agreement thereby creating ambiguity in the Agreement. According to the plaintiff, such ambiguity must be construed against the defendants and in favor of her interpretation and belief that she could substitute the one week of CME for regular vacation time.

According to the plaintiff's Employment Agreement, under Section 9, "Vacation Period," the plaintiff was provided three weeks of paid leave: two weeks of "vacation" per year and one week of "CME." The plaintiff testified that she negotiated these terms specifically, as the original agreement provided for only two weeks of vacation. Although listed under the subheading "Vacation Period," this does not mean the plaintiff was free to use the week

---

[15](...continued)
not a function of the plaintiff's job. (Doc. 34, Ex. C, p. 19).

of CME as she chose, as it was specifically designated for CME. In fact, the term "vacation" simply refers to "the number of days or hours per year for which an employer agrees to pay workers while they are not working." http://www.merriam-webster.com/dictionary/vacation. Therefore, "vacation" does not only refer to personal time off which an individual can do with as he/she chooses, but also to situations such as CME where an individual is being paid although the individual is not actually working. The language of the Agreement provides for the allocation enforced by Dr. Jaditz in the June 2, 2009, communication – that is, that the plaintiff would have two weeks of paid leave for vacation to do with as she pleased, and the other week of paid leave was to be used for CME. Despite the plaintiff's belief that she was entitled to convert the week provided for CME into a vacation week to do with as she chose and had done this in the prior year, nothing in the Agreement speaks to this. The court finds that Dr. Jaditz's decision to enforce the clear and unambiguous provision of the Agreement which delegates two weeks of leave for vacation and one week for CME does not constitute an adverse employment action.

Finally, the plaintiff argues that, even if the court finds that her claims of a demotion and reduction in benefits do not constitute adverse employment action individually, in conjunction with Dr. Jaditz's statement in response to her inquiry as to whether her job was in jeopardy that "I am not telling you there's the door, you're not fired . . . yet," and the fact that she received an

unfavorable performance evaluation after May 12, 2009, when she informed Mrs. Jaditz that she no longer had to go for fertility treatments, she suffered conditions sufficient to amount to her constructive termination which, in turn, amounts to adverse employment action.

Where an employer knowingly permits conditions of discrimination to persist that are so intolerable that a reasonable person subject to them would resign, and an employee, in fact, is forced to resign, the employer may be liable on a constructive discharge theory. See Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001). Under these conditions, the resignation is treated as a dismissal by the employer, which renders the resignation an adverse employment action. See Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167-68 (3d Cir. 2001). The test used by the court to determine whether the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign is an objective one. Id. The objective threshold which must be crossed in order for a plaintiff to establish a constructive discharge is that she must establish that the employer's actions which form the factual foundation of the claim must work some serious and substantial tangible harm which, as in the case of discrimination, alters an employee's compensation, terms, conditions or privileges of employment and makes working conditions so unpleasant or intolerable that a reasonable person in the plaintiff's shoes would resign. The Third Circuit has found that "not everything that makes an employee unhappy"

qualifies, for '[o]therwise, minor and even trivial employment actions' that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300-01 (3d Cir. 1997) (citations omitted).

In Clowes v. Allegheny Valley Hospital, 991 F.2d 1159, 1161 (3d Cir. 1993), the Third Circuit identified several situations often cited as "indicative of constructive discharge: (1) a threat of discharge; (2) suggestions or encouragement of resignation; (3) a demotion or reduction of pay or benefits; (4) involuntary transfer to a less desirable position; (5) alteration of job responsibilities; (6) unsatisfactory job evaluations." Suders v. Easton, 325 F.3d 432, 445 (3d Cir. 2003) (overruled on other grounds). However, the court has cautioned that the absence of these "commonly cited" factors is "not necessarily dispositive," Duffy, 265 F.3d at 168, and noted in Clowes that the cases therein were "cited solely to illustrate some of the factors on which plaintiffs claiming constructive discharge have relied . . . [but] express [ing] no view as to whether these decisions gave those factors the proper weight." Clowes, 991 F.2d at 1161, n.1. Accordingly, the presence of Clowes factors is not dispositive either. See Kesselman v. Sanofi-Aventis U.S. LLC, 2012 WL 1079962 (E.D. Pa. Mar. 30, 2012).

In considering the plaintiff's argument that she was constructively discharged, the court has already determined that her claims that she was demoted and that she suffered a reduction of benefits did not constitute

tangible adverse employment actions. The court finds no more favorably on the plaintiff's claims regarding Dr. Jaditz's comment to her, or the fact that she received an unfavorable review from Dr. Jaditz.

Specifically, as to the remark made by Dr. Jaditz, there is no indication that Dr. Jaditz actually threatened to fire the plaintiff – this was simply the plaintiff's subjective interpretation. Whether the plaintiff subjectively felt as if this were some kind of "veiled threat" by Dr. Jaditz is not the deciding factor; instead, the court must determine whether a reasonable person in the plaintiff's position would have felt that the alleged circumstances were too onerous to bear and rendered the working conditions objectively intolerable. Duffy, 265 F.3d at 169. While the record may support the fact that the plaintiff found her working environment to be stressful, the record does not support a finding that it was so intolerable that someone else in the plaintiff's position would have felt forced to resign.

As to the plaintiff's claim that she was given an unfavorable evaluation after May 12, 2009, the plaintiff admits that she requested the Dr. Jaditz provide her with suggestions as to how she could perform better within the practice. Dr. Jaditz then provided her with the correspondence of June 2, 2009, in which he outlined the requirements and expectations of his practice. During her deposition, the plaintiff agreed that a vast majority of these suggestions were reasonable. In fact, the only challenges to Dr. Jaditz's suggestions related to submitting her hours on her time card and not being

allowed to use the CME week for a vacation week. These matters have already been addressed. The fact that the plaintiff agreed with a vast majority of the suggestions in Dr. Jaditz's memorandum does not support her claim that these suggestions made her working conditions so intolerable that a reasonable person in her shoes would feel forced to resign.

In light of all of the above, the court finds that the plaintiff has not adequately established that she suffered any adverse employment action. The defendants' motion for summary judgment will therefore be granted to the extent that it is argued that the plaintiff has failed to meet the third prong of her *prima facie* case. This finding obviates the court's need to proceed to the fourth prong of the *prima face* case or to continue with the <u>McDonnell Douglas</u> analysis. Judgment will be entered in favor of the defendants and against the plaintiff as to the Title VII and PHRA claims.

## B.   ADA Claim

The defendants argue that they are entitled to summary judgment on the plaintiff's ADA claim because pregnancy does not constitute an impairment under the ADA. The court agrees.

The statute itself clearly indicates that pregnancy was not to be considered an impairment covered by the Act.

> The definition of term "impairment" does not include physical characteristics such as eye color, hair color, left-handedness, or height, weight or muscle tone that are within "normal" range and

are not the result of a physiological disorder. The definition, likewise does not include characteristic predisposition to illness or disease. Other conditions, such as pregnancy, that are not the result of a physiological disorder are also not impairments.

29 C.F.R. §1630 Appendix.

This interpretation of the ADA is consistent with the concept that discrimination for pregnancy is already covered by the PDA. Byerly v. Herr Foods, Inc., 1993 WL 101196 (E.D. Pa. Apr. 6, 1993).

In addition, pregnancy is a temporary condition that gives rise to a temporary disability. In re Carnegie Ctr. Associates, 129 F.3d 290, 303 (3d Cir. 1997). Regulations that were promulgated pursuant to the ADA define disability as: (1) A physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 29 C.F.R. §1630.2(g).

"Substantially limits" is defined to mean: (I) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. §1630.2(j)(1).

The factors that have been identified to assist in determining whether a particular "disability" is of such severity as to come within the protection

intended under the ADA include: (I) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. §1630.2(j)(2).

"Disabilities" that are temporary do not, by definition, rise to the level of substantially limiting a major life function. In re Carnegie Ctr. Associates, 129 F.3d at 303 (citing Rogers v. International Marine Terminals, Inc., 87 F.3d 755, 758 (5th Cir.1996) ("[T]emporary conditions that are not chronic usually do not rise to the level of a "disability.") and (Taylor v. Dover Elevator Systems, Inc., 917 F.Supp. 455, 461 (N.D.Miss.1996)) ("[T]emporary injuries with no permanent effects are ordinarily not considered disabilities under the ADA.") (citing Evans v. City of Dallas, 861 F.2d 846, 852-53 (5th Cir.1988); Rakestraw v. Carpenter Co., 898 F.Supp. 386, 390 (N.D.Miss.1995); Oswalt v. Sara Lee Corp., 889 F.Supp. 253, 257 (N.D.Miss.1995), *aff'd*, 74 F.3d 91 (5th Cir.1996)).

In her opposing brief, the plaintiff argues that the ADA contemplates "[a]ny physiological disorder or condition . . . affecting one or more body systems, such as . . . reproductive . . .," to be considered physical or mental impairments. 29 C.F.R. §1630.2(h)(1). The plaintiff argues that she suffers from a fertility issue, which constitutes an impairment affecting her reproductive system, and that the defendants were aware of her fertility issue. Considering other factors, the plaintiff concludes that it is "clear that the

Defendants regarded [her] fertility issues and subsequent pregnancy as impairments and/or limitations to her ability to adequately perform her job duties."

While the court agrees with the plaintiff that infertility constitutes an impairment under the ADA, See e.g. Pacourek v. Inland Steel Co., Inc., 916 F.Supp. 797 (N.D. Ill. 1996); Saks v. Franklin Covey Co., 117 F.Supp.2d 318 (S.D.N.Y. 2000), and that the defendants knew about the plaintiff's treatments for infertility, the court finds that infertility was not the basis of the plaintiff's ADA claim. To this extent, in reviewing Count III of the plaintiff's amended complaint, every mention of alleged discriminatory treatment references the defendants' suspicion of the plaintiff's pregnancy, not her infertility. The plaintiff will not be allowed to amend her claim through her opposing brief simply because of the realization that her allegations do not sustain a claim under the ADA. The defendants' motion for summary judgment will therefore be granted with respect to the plaintiff's ADA claim.

### C.    FMLA Claim

The FMLA provides that an eligible employee "shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . because of a serious health condition that makes the employee unable to perform the functions of [her] position." 29 U.S.C. §2612(a)(1)(D); see Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005). An employee's right to leave

under the FMLA cannot be waived or bargained away. 29 C.F.R. §825.220(d). In addition, the employee need not request leave under the FMLA, but need only request leave under circumstances that indicate it is FMLA eligible. 29 C.F.R. §825.302(c).

After the employee requests leave the employer must, within five (5) days, provide the employee with "written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations," including whether the leave will be counted as FMLA leave and the employee's right to restoration. 29 C.F.R. §825.300(b)(1). "In all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying, and to give notice of the designation to the employee as provided in this section." 29 C.F.R. §825.208.

The FMLA provides various protections for employees who are eligible for or have taken FMLA leave. See 29 U.S.C. §2615; 29 C.F.R. §825.20. Under the "entitlement" or "interference" provision, it is illegal for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" under the FMLA. 29 U.S.C. §2615(a)(1); see Callison, 430 F.3d at 119. "Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the" FMLA. 29 C.F.R. §825.220(b).

To establish a violation of the entitlement provision, an employee need

only show that she was entitled to FMLA benefits, 29 U.S.C. § 2612(1), and the employer interfered with them, 29 U.S.C. § 2614(a)(1). Callison, 430 F.3d at 119. "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." Id. at 120. Consequently, it is irrelevant whether the employer had a legitimate reason to deny the benefits or treated disparately or similarly other employees. Id. at 119–20.

The plaintiff claims that she spoke with Diane Arnoni on June 2, 2009, with respect to taking intermittent FMLA leave beginning June 4, 2009, for pre-natal visits. Setting aside whether the plaintiff gave sufficient notice that she was in need of FMLA leave, see 29 U.S.C. §2612(e)(2)(B), Ms. Arnoni would have had five days to provide a written response to the plaintiff's request for leave. 29 C.F.R. §825.300(b). However, after speaking to Ms. Arnoni on June 2, 2009, the plaintiff called of sick on June 4, 2009, and then resigned on June 5, 2009. Therefore, the plaintiff left the defendants' employ before a response was required to her request.

The plaintiff argues in her opposing brief, regardless of the provision which allows the employer five days to provide a written response to a request for FMLA leave, Ms. Arnoni, in fact, provided her an oral response that very day when she told the plaintiff that her FMLA request was premature in that the plaintiff could use her sick days. The plaintiff argues that this was an attempt to discourage her from using her FMLA leave and is sufficient to form

the basis for an FMLA interference claim. Despite the plaintiff's argument, the FMLA provides that an employer may require an employee to substitute other accrued paid for any part of the 12-week period of FMLA leave.

In light of the above, the court finds that the defendants are entitled to judgment as a mater law on the plaintiff's FMLA claim.

## IV.    CONCLUSION

Based upon the foregoing, an appropriate order shall issue.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date:  March 31, 2014**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2011 MEMORANDA\11-1501-01.wpd

29